Gregory B. Collins (#023154)
Molly Eskay (#028212)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile:  (480) 421-1002
gbc@kflawaz.com
cme@kflawaz.com

*Attorneys for ThermoLife International, LLC*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ThermoLife International, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Maximum Human Performance, a New Jersey corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>(Jury Trial Demanded) |

Plaintiff ThermoLife International, LLC for its Complaint against defendant Maximum Human Performance, Inc. alleges upon personal knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF ACTION

1.     Plaintiff ThermoLife International, LLC ("ThermoLife") brings claims for false advertising and common law unfair competition against its competitor Maximum Human Performance, Inc. ("MHP") and its "NO-Bomb"-branded products.

2.     ThermoLife brings these claims because MHP has improperly competed with ThermoLife in the dietary supplement market, purporting to sell "KNO3 Nitrite-NO Technology" containing, among other ingredients, potassium nitrate and sodium nitrite "to

set itself apart from other NO formulas," a "revolutionary technology [which] utilizes bioactive nitrates and nitrates." MHP advertises that this "KNO3 Nitrite-NO Technology utilizes a newly discovered nitric oxide pathway, whereby nitrates and nitrates are recycled into nitric oxide to provide even greater vasodilation and sustained muscle pumps." It claims to be the "most advanced clinically researched NO-Bomb formula ever."

3. In actuality, independent testing has found that NO-Bomb does not contain a meaningful amount of nitrates or nitrites, much less "bioactive" amounts or any amounts necessary to even start to support MHP's marketing claims. In fact, at least one test found only 2.46 milligrams of nitrates per serving, and only 28.1 parts-per-million of nitrites per serving. As explained below, these miniscule amounts are not sufficient to cause the advertised benefits.

4. Competition in the supplement industry is fierce, with each company seeking to discover and market the next breakthrough product that will help athletes achieve muscle pumps and support muscle growth and performance. ThermoLife owns and licenses no less than fifteen U.S. patents pertaining to nitrate or nitrite technology designed, at least in part, to deal with athletic performance. Faced with stiff competition and the ever-increasing desire of the market for the next great pre-workout supplement, dietary supplement makers such as MHP have sought to boost sales, yet attempt to avoid infringing ThermoLife's patents, by falsely indicating they have nitrate or nitrite technology while not including enough of the ingredients necessary to actually incorporate that technology.

5. ThermoLife brings this action to enjoin MHP from continuing to falsely market its products. ThermoLife also seeks to recover for the competitive injury that MHP's false advertising and unfair competition have caused to ThermoLife's business. MHP must be stopped from continuing to profit from its false and misleading statements, and any profit already earned from MHP's misconduct must be disgorged.

## **PARTIES, JURISDICTION AND VENUE**

6. Plaintiff ThermoLife is an Arizona limited liability company. ThermoLife's principal place of business is 3914 E. Chandler Blvd, Phoenix, Arizona 85048.

7. Upon information and belief, defendant MHP is a New Jersey corporation. MHP's principal place of business is 21 Dwight Place, Fairfield, New Jersey.

8. MHP ships and sells products nationwide, including in Arizona.

9. MHP advertises its products nationwide, including in Arizona.

10. The Court has jurisdiction over Plaintiff's federal claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, and 1338(a). Jurisdiction over the state law claims is based on 28 U.S.C. §§ 1338(b), and 1367.

11. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between MHP and ThermoLife, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12. Venue is proper in this district under 28 U.S.C. § 1391(b)-(c), because a substantial part of the events or omissions giving rise to ThermoLife's claims occurred in this district. Venue with respect to MHP is also proper in this district because MHP is subject to personal jurisdiction in this district.

## **FACTUAL ALLEGATIONS**

**A.    ThermoLife**

13. Ron Kramer ("Kramer") founded ThermoLife in 1998. Prior to founding ThermoLife, Kramer was a gym owner who had competed in bodybuilding and later promoted professional bodybuilding competitions for the International Federation of Bodybuilders.

14. Between 1994 and 1997, Kramer opened and operated a Gold's Gym in Santa Cruz, California.

15. During his time as a bodybuilder, promoter, and gym owner, Kramer discovered that many supplements in the industry failed to meet any quality control standards. Often supplements were spiked with hidden ingredients and labeled

incorrectly.

16. At the time ThermoLife was established, few supplements were clinically researched or field tested. Even today, relatively few supplements have been proven to work as advertised.

17. In 1998, Kramer founded ThermoLife in order to provide the public with quality proven supplements, at all times committed to selling only the purest, most effective and innovative products.

18. By relying on supposedly proprietary formulas, supplement companies often hide the ingredients in their products from consumers. Unlike other supplement companies, ThermoLife developed unique products and formulas that it fully disclosed to the public. In this way, ThermoLife allowed consumers to know exactly what products and raw materials they consume.

19. ThermoLife has been granted 14 U.S. patents to date (with several more pending) and exclusively licensed other patents with respect to nitrate and nitrite technology. These patents protect ThermoLife's innovative and proven product and ingredient offerings from being copied by ThermoLife's competitors.

20. By fully disclosing its formulas and relying on scientifically proven and protected formulas and ingredients, ThermoLife has taken a lead role in ending the deceptive business practices that have plagued the supplement industry.

21. ThermoLife's primary business has become licensing its technology and supplying its patented ingredients to some of the supplement industry's largest companies.

22. Since November 6, 2013 MHP has held a non-exclusive license to two of ThermoLife's patents until October 31, 2016. MHP is fully aware of ThermoLife's nitrate and nitrite technology, the fact that ThermoLife sells and licenses nitrate and nitrite technology, and its value to ThermoLife and the sports nutrition community.

**B.   MHP**

23. Upon information and belief, MHP started doing business in 1997, and is owned by Gerard Dente, a former competitive bodybuilder.

4

24. Gerard Dente is the face of MHP. A former competitive bodybuilder, Gerard Dente markets MHP's products at trade shows and on the internet.

25. Gerard Dente has personally claimed that "product innovation is still the backbone of MHP's philosophy and we [MHP] are still the trusted brand of elite athletes….we also want to be the trusted brand for anyone who is putting forth the effort in the gym to achieve their goals."

26. In addition, Mr. Dente has publicly stated that MHP's "unwavering commitment to research and product development has established MHP as an industry innovator and trusted brand among some of the world's greatest bodybuilders, powerlifters and pro athletes."

27. MHP also relies on its sales representatives to market its products.

28. MHP's products are also marketed and sold nationwide on the internet and in vitamin and dietary supplement stores.

C. **MHP's NO-Bomb**

29. NO-Bomb is one of MHP's top selling supplements.

30. According to its label, NO-Bomb has "clinical strength" and helps its user "sustain massive muscle pumps" and "increase nitric oxide & blood flow," among other things.

31. NO-Bomb, according to its label, offers "KNO3 Nitrite-NO Technology" which contains, among other ingredients, potassium nitrate and sodium nitrite "to set itself apart from other NO formulas," and purports to be a "revolutionary technology [which] utilizes bioactive nitrates and nitrates."

32. According to the Supplement Facts on its label, NO-Bomb's "KNO3 Nitrite-NO Technology and NOSA (Nitric Oxide Sustaining Agent)" is comprised of 136.5 milligrams per serving size of 3 capsules, and contains the following ingredients as presented in this order:
- K-NOx beet root juice (Beta vulgaris) extract (containing K-Nitrate and Na-Nitrite)
- Grape seed extract (95% proanthocyanidins)

5

- Pine bark extract (85% proanthocyanidins)
- Butea superba (root)
- Glycyrrhiza uralensis (root)
- Forstyhia suspensa extract (fruit)
- AstaREAL (astaxanthin)
- Schizonepeta tenuifolia extract (aerial parts)

33. MHP advertises with respect to NO-Bomb that this "KNO3 Nitrite-NO Technology utilizes a newly discovered nitric oxide pathway, whereby nitrates and nitrates are recycled into nitric oxide to provide even greater vasodilation and sustained muscle pumps."

34. MHP claims that NO-Bomb is the "most advanced clinically researched NO-Bomb formula ever."

35. More specifically, on its website MHP advertises NO-Bomb as follows:

**NEW NITRIC OXIDE PRODUCING PATHWAY DISCOVERED**
During MHP's formula development of our original NO-BOMB, researchers discovered a powerful new technology to boost NO – the revolutionary KNO3 Nitrite-NO Technology. It turns out that the human body has a vitally important alternate NO producing metabolic pathway that operates independently of the well-known arginine-nitric oxide synthase (NOS) pathway. This new NO metabolic pathway has the ability to make nitric oxide directly from dosage-supplied bioactive nitrates and nitrites. This novel nitric oxide synthesis pathway is so significant that a wave of new research is flooding the medical journals about how to use this new pathway to create immense vasodilation that will help pump your muscles to new levels. The KNO3 Nitrite-NO Technology is a potent nitrovasodilator with direct vasodilating action, plus it can quickly be converted to nitric oxide to maximize the pool of nitrovasodilating agents.

**EXTRA NITRIC OXIDE PRODUCING POWER DURING WORKOUTS**
In addition to the importance of loading the bloodstream and muscle tissues with nitrates/nitrites as a general rule for sustaining nearly perpetual NO production, there are additional significant benefits that take advantage of this new pathway during strenuous training sessions

to trigger even greater levels of nitric oxide, ensuring maximum vasodilation. Among the other reasons why researchers have determined the arginine/NOS pathway is at times inadequate is that it requires oxygen to make nitric oxide. During your grueling iron pumping resistance training workouts, oxygen depletion occurs and arginine/NOS dependent NO production is reduced because this pathway requires oxygen to operate. However, with the new KNO3/Nitrite-NO Technology, NO production is independent of oxygen levels and can actually increase NO production when oxygen tissue levels are low, which occurs during resistance training. Furthermore, nitrate/nitrite induced production of nitric oxide is also enhanced under the common resistance training caused condition of lower body pH levels. As your bloodstream and muscles become low in oxygen levels, and acidic (low pH), this can actually trigger nitrites to produce even more NO, just when your body needs it to keep your muscles going strong and resist fatigue. This helps you to crank out more reps and sets, and improves rest between sets……

**WHAT IS THE KNO3-NO NITRITE TECHNOLOGY?**
It turns out that the human body has a vitally important alternate NO producing metabolic pathway that operates independently of the well-known arginine-nitric oxide synthase (NOS) pathway. This NO metabolic pathway has the ability to make nitric oxide directly from dosage-supplied bioactive nitrates and nitrites. This novel nitric oxide synthesis pathway is so significant that a wave of new research is flooding the medical journals about how to use this new pathway to create immense vasodilation that will pump your muscles to new levels. The KNO3 Nitrite-NO Technology is a potent nitrovasodilator with direct vasodilating action, plus it can quickly be converted to NO to maximize the pool of nitrovasodilating agents.

36.  MHP's statements regarding the efficacy of the "KNO3 Nitrite-NO Technology" are literally and provably false. The KNO3 Nitrate-NO included in NO-Bomb does not contain a sufficient amount of nitrates and nitrites to enhance physical performance ("helps you to crank out more reps and sets") or to reduce oxygen consumption ("During your grueling iron pumping resistance training workouts, oxygen depletion occurs and arginine/NOS dependent NO production is reduced because this pathway requires oxygen to operate. However, with the new KNO3/Nitrite-NO Technology, NO production is independent of oxygen levels and can actually increase NO production when oxygen tissue levels are low, which occurs during resistance training").

7

### D. MHP's False Advertising

37. Oddly enough, ThermoLife learned of MHP's false advertising when it sent MHP a cease-and-desist letter related to MHP's unlicensed use of one of ThermoLife's patented uses for nitrates. As explained below, in arguing that its product did not infringe ThermoLife's patent, MHP disclosed that its product only included a miniscule amount of nitrates; the diminutive amount of nitrates included in the product could not possibly have any effect on human performance or oxygen consumption.

38. On December 31, 2015, ThermoLife became the exclusive license of U.S. Patent No. 9,180,140 ("the '140 Patent"). Claim 1 of the '140 Patent states as follows: "A method for non-therapeutically reducing oxygen consumption (VO2) of a mammal and enhancing physical performance of the mammal during physical exercise, the method comprising: orally administering inorganic nitrate and/or nitrite to said mammal up to three days prior to the mammal performing physical exercise and in a dose of about 0.01-10 mmol inorganic nitrate/kg bodyweight/day and/or of about 0.001-1 mmol inorganic nitrite/kg bodyweight/day; wherein administration of said inorganic nitrate and/or nitrite will result in reduced oxygen consumption (VO2) in and enhanced physical performance of said mammal during the physical exercise as compared with the physical performance of said mammal during the physical exercise in the absence of administration of the inorganic nitrate and/or nitrite."

39. Based on a human's average body weight of approximately 75 kg, 0.01-10 mmol inorganic nitrate/kg bodyweight/day amounts to approximately 46.5 mg to 46,500 mg of inorganic nitrate a day, and 0.001-1 mmol inorganic nitrite/kg bodyweight/day amounts to approximately 3.45 mg to 3,450 mg of inorganic nitrite a day.

40. Based on MHP's advertisements relating to enhanced physical performance ("helps you to crank out more reps and sets") and the reduction of oxygen consumption ("During your grueling iron pumping resistance training workouts, oxygen depletion occurs and arginine/NOS dependent NO production is reduced because this pathway requires oxygen to operate. However, with the new KNO3/Nitrite-NO Technology, NO

production is independent of oxygen levels and can actually increase NO production when oxygen tissue levels are low, which occurs during resistance training"), MHP's NO-Bomb-branded products would need to supply no less than 46.5 mg of inorganic nitrate and/or 3.45 mg of inorganic nitrite a day to support MHP's advertising claims.

41. On March 3, 2016, ThermoLife's counsel, Greg Collins of the law firm of Kercsmar & Feltus PLLC, wrote to MHP with an infringement analysis outlining the facts supporting the alleged infringement by NO-Bomb of, among other claims, Claim 1 of the '140 Patent, based squarely on MHP's advertising claims.

42. On April 6, 2016, MHP's counsel, William Cass of the law firm of Cantor Colburn LLP, responded to Greg Collins' letter, in relevant part, as follows: "I have had an opportunity to discuss this matter with my client and it does not appear that my client's product meets the requirements of any of the independent claims of the '140 Patent. Specifically, the accused product does not contain the required amounts of nitrates and/or nitrites."

43. Accordingly, MHP has admitted that NO-Bomb does not have a sufficient amount of nitrates or nitrites to support its advertising claims, namely its claims the NO-Bomb enhances physical performance ("helps you to crank out more reps and sets") and reduces oxygen consumption ("During your grueling iron pumping resistance training workouts, oxygen depletion occurs and arginine/NOS dependent NO production is reduced because this pathway requires oxygen to operate. However, with the new KNO3/Nitrite-NO Technology, NO production is independent of oxygen levels and can actually increase NO production when oxygen tissue levels are low, which occurs during resistance training").

44. To confirm MHP's admission, ThermoLife had a sample of NO-Bomb tested by Covance Laboratories. Covance Laboratories found only 2.46 mg/serving of nitrates, and 28.1 ppm/serving of nitrites per serving (MHP recommends that NO-Bomb's users should take one serving [comprised of three capsules] of the product before working out).

45. Covance Laboratories' testing confirms that NO-Bomb provides its users less than 46.5 mg of inorganic nitrate a day and less than 3.45 mg of inorganic nitrite a day. This dosage is insufficient to enhance physical performance and reduce oxygen consumption.

46. MHP's statements, through its counsel, that it does not have nitrates or nitrites in amounts sufficient to enhance physical performance and reduce oxygen consumption, as confirmed by Covance Laboratories' testing results, reflect an admission by MHP that it has been falsely advertising NO-Bomb, knowing that the ingredients in the product cannot enhance physical performance (despite the claim "helps you to crank out more reps and sets") and cannot reduce oxygen consumption (despite the claim, "During your grueling iron pumping resistance training workouts, oxygen depletion occurs and arginine/NOS dependent NO production is reduced because this pathway requires oxygen to operate. However, with the new KNO3/Nitrite-NO Technology, NO production is independent of oxygen levels and can actually increase NO production when oxygen tissue levels are low, which occurs during resistance training").

47. As a result of MHP's false and/or misleading statements, ThermoLife has been injured, by direct diversion of sales from itself to MHP, by direct diversion of sales from ThermoLife's licensees of nitrate and nitrite technology to MHP, or by a lessening of the goodwill associated with ThermoLife's products, ingredients, and intellectual property.

**FIRST CLAIM FOR RELIEF**

(False Advertising Under 15 U.S.C. § 1125(a)(1)(B))

48. Plaintiff realleges and incorporates herein by reference each and every allegation of this Complaint as is fully set forth herein.

49. As alleged above, MHP has made false statements of fact in commercial advertisements about its products, including on its labels and in its internet marketing.

50. MHP's following statements with respect to its No-Bomb-branded products, without limitation, are literally and provably false:

- helps you to crank out more reps and sets

- During your grueling iron pumping resistance training workouts, oxygen depletion occurs and arginine/NOS dependent NO production is reduced because this pathway requires oxygen to operate. However, with the new KNO3/Nitrite-NO Technology, NO production is independent of oxygen levels and can actually increase NO production when oxygen tissue levels are low, which occurs during resistance training.

- The KNO3 Nitrite-NO Technology is a potent nitrovasodilator with direct vasodilating action, plus it can quickly be converted to NO to maximize the pool of nitrovasodilating agents.

51. To the extent these statements are not literally false, these statements improperly mislead and/or deceive consumers.

52. MHP's statements actually deceived or have the tendency to deceive a substantial segment of its audience. There is a substantial portion of dietary supplement consumers that will not purchase pre-workout products from companies that do not enhance physical performance or do not reduce oxygen consumption. Enhancing physical performance and reducing oxygen consumption is one of the primary reasons a consumer purchases and/or uses a pre-workout supplement, and MHP is well aware of this reason.

53. MHP's deception is material, in that it is likely to influence the purchasing decision of the public for whom it was intended.

54. MHP has caused the false statements alleged herein to enter interstate commerce.

55. As a primary competitor of MHP, ThermoLife has been injured as a result of MHP's false statements, by direct diversion of sales from ThermoLife's licensees of nitrate and nitrite technology to MHP, or by a lessening of the goodwill associated with ThermoLife's products, ingredients, and intellectual property.

56. ThermoLife has suffered a commercial injury based upon misrepresentations about MHP's products.

57. ThermoLife's injury is competitive, in that it is harmful to the ThermoLife's ability to compete with MHP.

58. MHP's false statements cause irreparable harm to ThermoLife and

11

ThermoLife's goodwill and business opportunities.

59. MHP's false statements are still available on the internet, in packaging, and advertising, and barring an order from this Court those statements will not be removed, permanent injunctive relief is necessary to prevent further irreparable harm to ThermoLife's business and goodwill. To prevent further immediate and irreparable harm to ThermoLife a permanent injunction should enter requiring MHP and those acting in concert with it to remove any false information MHP has published.

60. MHP's conduct as alleged is willful and exceptional, such that ThermoLife is entitled to an award of treble damages and its attorneys' fees.

## SECOND CLAIM FOR RELIEF
(Common Law Unfair Competition)

61. Plaintiff realleges and incorporates herein by reference each and every allegation of this Complaint as is fully set forth herein.

62. MHP's conduct constitutes unfair competition under the common law of the State of Arizona.

63. MHP has unfairly competed with ThermoLife under the common law of the State of Arizona by knowingly using false and misleading statements to market its products in direct competition with ThermoLife.

64. MHP's unfair competition with ThermoLife has caused harm directly to ThermoLife.

65. MHP's actions were committed fraudulently and maliciously and in conscious disregard of ThermoLife's rights, with evil mind and intent to injure ThermoLife.

## JURY TRIAL DEMAND

1. Plaintiff requests a trial by jury on all aspects of the First Amended Complaint.

## PRAYER FOR RELIEF

WHEREFORE, ThermoLife demands judgment against defendant MHP as

follows:

A. For an award disgorging any and all monies earned by MHP in connection with the sale of No-Bomb-branded products in an amount which shall be proven at trial;

B. For an award of compensatory and/or restitutionary damages in favor of ThermoLife in an amount to be proven at trial;

C. For an award of treble damages under 15 U.S.C. § 1117 and 15 U.S.C. § 1125(a);

D. For an award of ThermoLife's attorneys' fees under 15 U.S.C. § 1117;

E. For prejudgment interest on any liquidated sum determined to be due Plaintiff;

F. For post-judgment interest on any judgment;

G. For their reasonable attorneys' fees, costs and expenses incurred herein by Plaintiff as permitted by law;

H. For punitive damages in an amount sufficient to deter MHP from future wrongful and outrageous conduct;

I. An Order permanently enjoining, MHP and all those persons in active concert or participation with them, from making false statements on the internet, in labeling, and in advertising with respect to their NO-Bomb-branded products and an order requiring MHP and those acting in concert or participation with them to remove the false statements;

J. For such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 9th day of June, 2016.

KERCSMAR & FELTUS PLLC


By: *s/Gregory Collins*
    Gregory B. Collins
    Molly Eskay
    7150 East Camelback Road, Suite 285
    Scottsdale, Arizona 85251

*Attorneys for ThermoLife International, LLC*